### MILLER et al. v. SCHLOSS.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

1. BROKERS (§ 28*)—ACCOUNTS WITH CUSTOMER.

As between a cotton broker and his customer, where the broker carries two accounts for the customer and one account shows a loss and the other a profit, the broker, in order to ascertain the amount due from him to his customer or from his customer to him, may set off the profit in one account against the loss in the other and pay or receive only the net difference.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 21; Dec. Dig. § 28.*]

2. BROKERS (§ 28*)—COTTON BROKERS—SETTLEMENT WITH CUSTOMER—IMPLIED PROMISE.

Where a cotton broker carried two accounts for the same customer, also a broker, and in settlement charged, with the customer's consent, a loss on one account against a profit on the other, knowing that the account charged against, though carried in the customer's name, in effect belonged to a third person, there was an implied promise by the customer that he would pay such third person and protect the broker from any demand by reason of the charge made against his account.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 21; Dec. Dig. § 28.*]

3. RELEASE (§ 30*)—OPERATION AND EFFECT—DEBTS ORIGINATING WITH RELEASE.

Where a cotton broker settled with a customer by charging, with the customer's consent, a loss on one of the customer's accounts against a profit on another, knowing that the latter account in effect belonged to a third person, a release given the broker, which purported to discharge him from all manner of debts and obligations down to the date of its execution and delivery, did not release him from his implied obligation, which came into existence at the moment of the execution of the release, to pay such third person and save the broker harmless as against a claim for the charge made against such person's account.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 23; Dec. Dig. § 30.*]

4. APPEAL AND ERROR (§ 1176*)—DECISION—DIRECTION OF JUDGMENT.

Where the action is based upon an obligation implied by law, and the essential facts are not in dispute and are such as could not be changed upon a new trial, the Supreme Court, in reversing the case, will direct a judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4588–4596; Dec. Dig. § 1176.*]

Ingraham, P. J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, New York County.

Action by Nathan J. Miller and others against Harry B. Schloss. From judgment for defendant and denial of new trial, plaintiffs appeal. Reversed, and judgment directed for plaintiffs.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Benjamin N. Cardozo, of New York City, for appellants.
Edward L. Blackman, of New York City, for respondent.

SCOTT, J. This is an action for moneys had and received. The complaint contained three counts. The third, however, was abandoned at the trial, and plaintiffs elected to stand on the first and second. The first cause of action alleges that on April 27, 1904, plaintiffs paid to defendant the sum of $6,830 upon defendant's promise to pay and apply the same in extinguishment of plaintiffs' liability for the same amount to one C. P. Hunt; that defendant failed to pay the said Hunt, who thereupon sued plaintiffs for said amount and recovered judgment, which was paid. The second cause of action is in the usual form for moneys had and received generally for plaintiffs' use. The answer, besides certain formal denials, pleads a general release executed by plaintiffs on said April 27, 1904.

Athough the record is a voluminous one, the essential facts are not in dispute and are not complicated. In the years 1903 and 1904 the plaintiffs (or their predecessors in business under the same firm name) were cotton brokers in the city of New York and members of the New York Cotton Exchange. Defendant was also a member of said Cotton Exchange and resided in Memphis.

[1] Defendant's business, or an important part of it, was to solicit orders from customers to be executed on the New York Cotton Exchange. These he turned over to plaintiffs for execution. They carried them out, and the commissions, which were considerable, were divided between plaintiffs and defendant. The accounts on plaintiffs' books were kept in defendant's name; no mention being made of the customers whose orders defendant had received. In short, the business was carried on, as between plaintiffs and defendant, as if plaintiffs were the brokers and defendant was the customer. No doubt plaintiffs knew perfectly well that defendant was not carrying on these large operations wholly on his own account, but they never recognized his customers as their customers or recognized any one as their customer except only the defendant. This clearly appears to have been the understood course of business between the plaintiffs and defendant. Prior to January, 1904, defendant had three accounts with plaintiffs, a stock account, a loan account, and a cotton account No. 1, and so referred to hereinafter. In January, 1904, defendant opened a fourth account, known as cotton account No. 2. At defendant's request these two cotton accounts were separately kept; defendant advising plaintiffs with each order as to which account it belonged. Account No. 1 represented principally or wholly the transactions of one of defendant's customers named Barrett. Account No. 2 represented principally or wholly transactions of one of defendant's customers named C. P.

Hunt. Although, as has been said, it is evident that plaintiffs knew that the orders given them by defendant, to be executed on account of account No. 2, represented orders given to him by some other person, there is no evidence that they knew who that person was until about March 25, 1904. When defendant was called upon to furnish margins for account No. 1, it was his custom to draw drafts upon Barrett for the amount required. As to account No. 2, when called upon for margins, defendant's custom was to telegraph to Hunt, who deposited the required amount in a Memphis bank to the credit of plaintiffs' New York bank.

Both of the cotton accounts were active ones, and the business ran on without friction until late in March, 1904, when a large deficit developed in account No. 1, owing to the failure of Barrett to honor drafts drawn upon him by defendant in order to protect the losses incurred in said account. The other cotton account, No. 2, showed a considerable profit, and plaintiffs, insisting, as they did throughout, that the only person they knew or had dealings with was the defendant, and that both cotton accounts carried on their books were accounts with him and no one else, transferred to the credit of account No. 1, which showed a deficit, from account No. 2, which showed a profit, a considerable amount. Defendant vigorously objected to this course, insisting that, as the plaintiffs, at his request, had kept the accounts separately, they should continue to be kept distinct. He was apparently not financially able to make good the deficit in account No. 1, but notwithstanding this he insisted that plaintiffs should assume and bear the loss on account No. 1, remaining liable to him, and through him to his customers for the profit shown in account No. 2. It is true that defendant did not put his demands in this particular form, but such would have been the inevitable effect of a compliance with his demands. The plaintiffs continued to insist that they knew only defendant in the transactions; that they had no account with his customers; and that it was their right to offset his profits in one account against his losses in another. Finding it impossible to shake this determination on the part of plaintiffs, defendant arranged to transfer his business to another cotton exchange house and asked plaintiffs to make up his accounts with them. This was done by one of plaintiffs' bookkeepers; defendant standing at his side and understanding precisely how the account was made up. At that time defendant owed plaintiffs the sum of $2,500 on his loan account, and cotton account No. 1, notwithstanding the transfers to it, showed a debit balance against defendant of $8,670. On the other hand, cotton account No. 2, notwithstanding the amount transferred from it to account No. 1, showed a credit balance in plaintiffs' favor of $4,512.03, and there was also a balance in defendant's favor in his stock account of $404.18. The summary statement of the accounts between plaintiffs and defendant when the settlement was arrived at on April 25, 1904, was as follows:

| Dr. | | Cr. | |
|---|---|---|---|
| Loan a/c | $2,500 00 | No. 2 a/c | $4,512 03 |
| No. 1 a/c | 8,670 00 | Stock a/c | 404 18 |
| | | Balance | 6,253 79 |
| | $11,170 00 | | $11,170 00 |

Thereupon defendant paid plaintiffs the balance of $6,253.79 shown by the foregoing summary to be due to them, and in return they re-leased a lien they held upon defendant's cotton exchange membership, returned to him the dishonored drafts upon Barrett, and gave him a general release in the usual form.   The debit balance of $6,253.79 shown by the statement, and which defendant paid, was arrived at in part by crediting to account No. 1 a portion of the profit balance standing to the credit of account No. 2; and it is abundantly clear that when de-fendant accepted this summary account as correctly stating the balance due from him to plaintiffs, and paid the balance, he knew and under-stood that a part of his apparent indebtedness, as shown by account No. 1, had been reduced and treated as paid by the transfer to the credit of that account of a part of the balance standing to his credit on ac-count No. 2.   In other words, the losses incurred in account No. 1 were paid partly in cash and partly by the transfer of profits realized upon account No. 2.   If defendant had been the only person interested in both cotton accounts, as plaintiffs persistently claimed that he was as between themselves and himself, this method of striking a balance would have been unimpeachable, for it is obvious that where a broker carries two accounts for the same customer, and one account shows a loss and the other a profit, the broker, in order to ascertain the amount due from him to his customer or from his customer to him, is entitled to set off the profit in one account against the loss in the other and to pay or receive only the net difference.

[2] There remained, however, in this case the fact that the opera-tions in account No. 2, or the greater part of them, had been in fact carried on for C. P. Hunt, defendant's customer.   The evidence indi-cates that, when the settlement was arrived at between plaintiffs and defendant, the former knew that Hunt was defendant's principal in account No. 2 and might assert a claim (as he afterwards did) that he was entitled, as between himself and plaintiffs, to the credit balance shown on said account on the theory plaintiffs had no legal right, as against him, to use that balance to make up any loss upon any other account.   Of course defendant knew this also, and in fact so stated to plaintiffs.   The situation then, as known to both parties at the time of the settlement, was that defendant's acknowledged and admitted in-debtedness to plaintiffs was satisfied, and in fact paid, in part by the use, as a credit, of moneys earned by and standing to the credit of ac-count No. 2, and to which Hunt might assert a claim against plain-tiffs, and for which he undoubtedly had a claim against defendant.   Un-der these circumstances, defendant became bound, as a matter of law, to pay to his own principal, Hunt, the amount which has been taken from account No. 2 to make up the deficit shown on account No. 1; and, being so bound, the law implies a promise, even if none was ex-pressly made, from defendant to plaintiffs that the former would pay Hunt and thus protect plaintiffs from any claim or demand on Hunt's part.   The authorities are unanimous upon this question.

In Town of Bleecker v. Balje, 138 App. Div. 706, 123 N. Y. Supp. 809, this court said, speaking of an action for money had and re-ceived:

"It is the settled doctrine that money in the hands of one person, to which another is equitably entitled, may be recovered in a common-law action by the equitable owner upon an implied promise arising from the duty of the person in possession to account for and pay over to the person beneficially entitled. * * * It is unnecessary to trace the money which the defendant may have received, nor is it essential to the maintenance of the action to show that the money itself was actually received. The action in such form lies against an agent who discharges his own debt by offsetting it against an amount due his principal, although no money actually passes or comes to his hand. (Beardsley v. Root, 11 Johns. 464 [6 Am. Dec. 386]; Allen v. Brown, 44 N. Y. 228."

In Putnam v. Field, 103 Mass. 556, it was held that:

"An agent who has settled with his principal an account in which he has credited himself with the amount of a debt, owed by the principal, as having been paid by himself to the creditor, is liable therefor to the creditor on account for the money had and received."

Many other cases might be cited to the same effect. Langley v. Warner, 3 N. Y. 327; Wheelock v. Hastings, 4 Metc. (Mass.) 504; Emerson v. Baylies, 19 Pick. (Mass.) 55.

I think, therefore, that it must be accepted as a matter of law that by the settlement with plaintiffs, under all the circumstances, defendant assumed the obligation to pay Hunt whatever money of his had been credited against defendant's indebtedness to plaintiffs on account No. 1, and that this amounted, in law, to a promise to plaintiffs that he would pay Hunt. Undoubtedly, if the amount to be paid in cash by defendant to plaintiffs had been arrived at as the result of a compromise by which plaintiffs forgave a part of defendant's indebtedness to them, a different result might follow, but there is no claim and no evidence of any such compromise. There was the repeated insistence on plaintiffs' part that it was their right to transfer or credit from account No. 2 to make up a part of the deficit in account No. 1, and a final acquiescence by defendant in that method of fixing the ultimate balance due from him on all the accounts standing in his name. Defendant did not pay Hunt, and the latter subsequently sued plaintiffs and recovered judgment, which was paid. It is for the amount of this judgment that plaintiffs sue. Much is made by defendant of the fact that Hunt sued plaintiffs and recovered. We are unable to see that it affects the question between the parties to this action except to establish the fact that defendant did not pay Hunt as he had impliedly promised to do, and except also that it fixes the amount of plaintiffs' damage arising from defendant's default.

[3] It remains to consider the effect of the general release given to defendant by plaintiffs. It was in the usual form releasing defendant from all manner of debts and obligations down to the date of its execution and delivery. Did it operate to release defendant from the obligation to pay Hunt, which came into existence at the moment the release was given? We think not. The general rule is that demands originating at the time the release is given or subsequently, and demands subsequently maturing, are not as a rule discharged by the release, unless expressly embraced therein or falling within the fair import of the terms employed. 34 Cyc. p. 1092, and cases cited. In Hill v. Whidden, 158 Mass. 267, 33 N. E. 526, it was said:

"The release does not bar or discharge notes which came into existence as part of the transaction of giving the release, which were given as a part of the consideration for it, and which first took effect, to create a liability, at the instant when the release took effect. The release operated only on liabilities which were in existence when it was given."

To the same effect is Andrews v. Brewster, 124 N. Y. 433, 26 N. E. 1024.

In the present case defendant, when the release was given, owed plaintiffs nothing on account No. 2, the Hunt account. He did owe them a large sum on account No. 1, and with his knowledge and acquiescence that indebtedness was partially met and paid by transferring to its credit and offsetting against it the credit apparently due to him or to Hunt, his principal, on account No. 2. From these circumstances, as has been already pointed out, there arose by implication of law a new obligation on the part of defendant to plaintiffs, one which had never before existed and which therefore could not have been covered by the general release given as a part of the settlement agreement, to wit, the obligation to pay Hunt the amount of his money which had been appropriated to the payment of defendant's debt.

[4] The only other question is as to what disposition should be made of the appeal, and the answer to that question depends upon whether the assumption of the obligation to pay Hunt was a matter of fact or of law. The court in effect treated it as a question of fact, leaving it to the jury to say whether or not defendant agreed to pay Hunt. This, as we consider, was error. The obligation to pay Hunt the amount of his money which had been used to pay defendant's debt was an obligation created by law and by the fact of the appropriation of the balance standing to the credit of account No. 2. From that obligation the law implies a promise, and it is quite immaterial whether or not, at the time of making the settlement, defendant expressly agreed to pay Hunt, or even realized that he had incurred an obligation to plaintiffs to do so. It is evident that he never rested under the illusion that the settlement had wiped out his indebtedness to Hunt, as between themselves. Since, therefore, the defendant's promise to pay Hunt and save plaintiffs harmless from any claim by Hunt was one implied by law and was not one which was affected by the release, and there is no question as to plaintiffs' damages, the court should have directed a verdict for the plaintiffs; and, as the essential facts are not disputed and are such as could not be changed upon a new trial, it is our duty, in order to save the delay and useless formality of a new trial, not only to reverse the judgment appealed from, but also to direct a judgment for the plaintiffs. In order to do this it will be necessary that findings be made. These can be prepared and submitted on the settlement of the order.

Judgment appealed from reversed, and judgment directed for plaintiffs, with costs in all courts.

McLAUGHLIN, LAUGHLIN, and CLARKE, JJ., concur. INGRAHAM, P. J., dissents and votes for affirmance.